**UNITED STATES BANKRUPTCY COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| In re Thomas Patrick Ratz,<br><br>       Debtor.<br><br>------------------------------------------------<br><br>Maureen Sullivan,<br><br>       Plaintiff,<br><br>v.<br><br>Thomas Patrick Ratz,<br>aka Ex-Tream Concrete, Inc.<br>aka Ex-Tream Concrete Concepts, Inc.<br>aka Ex-Cellent Con-Crete Concept, Inc.,<br><br>       Defendant – Debtor. | Bankruptcy No.  10-B-11278<br>Adversary No. 10-A-01559<br>Chapter 7<br>Judge Manuel Barbosa |

## MEMORANDUM OPINION

This matter comes before the Court on Plaintiff's Second Amended Complaint to Determine Dischargeability of Debt and Objecting to Discharge.  For the reasons set forth herein, the Court will enter judgment in favor of the Defendant on Count III (Section 523(a)(2)(A)), Count IV (Section 727(a)(4)(A)), and  Count V (Section 727(a)(3)); Count I (Fraud in the Contract) and Count II (815 ILCS 505/2B) will be dismissed for lack of subject-matter jurisdiction.

## I.  FACTS AND BACKGROUND

Ms. Sullivan contacted Mr. Ratz in June 2007 to inquire about building an addition for her home. Ms. Sullivan wanted to build a wheelchair accessible bathroom addition to her home for her

adult daughter, and had learned of Mr. Ratz's name from a newspaper reporter. In August 2007, Mr.

Ratz met with Ms. Sullivan twice at her home to discuss the proposed addition to the home. At the

second meeting, on August 18, 2007, Ms. Sullivan entered into an agreement to build the addition

for $33,850.00, with a down payment of $3,000. To memorialize the agreement, Mr. Ratz filled out

a "proposal," which Ms. Sullivan signed under "acceptance of proposal." Mr. Ratz used a

pre-printed form, which had the letterhead of "Ex-Tream Con-Crete." The form was tailored for

simple concrete projects and had boxes to check for the type of project and type of materials to be

used. None of the boxes applied to a project of this size, so Mr. Ratz handwrote a basic description

of the addition project in the space for "additional comments." He also filled in the price and on a

hand-written addendum to the form the parties agreed that the contract was contingent on Ms.

Sullivan obtaining a mortgage loan, and that if financing could not be obtained the deposit would

be returned. The preprinted form contained few terms and included no provisions about the timing

of the project, subcontracting, obtaining permits, or other key details. Although there was a blank

for "architect," it was left blank, and elsewhere it stated that work was to be "performed is (sic)

accordance with the drawings and specifications submitted for the above work." In the letterhead

section for "Ex-Tream Con-Crete," it stated, "Owner: Ivy D. Ratz," and also stated that the company

was "Licensed & Insured." The preprinted portion of the form included a few disclaimers, such as

that the contractor "is not responsible for any lawn, utility damage, or landscaping alterations," but

also stated that "Public liability insurance on above work to be taken out by Ex-Tream Con-Crete."

Ms. Sullivan gave Mr. Ratz a personal check for $3,000 on August 18, 2007, as the deposit and

down payment.

Ms. Sullivan applied for financing through a special Illinois state program and eventually

obtained financing through Security Bank. However, it took longer than expected, and she did not

receive the financing until February 2009. The loan amount was for $31,000 to be held in escrow

by Security Bank, which would only be released upon submission of escrow disbursement request

forms. The bank made two disbursals to "Extream Concrete" by check. The first was a check issued

for $12,250.00 on February 24, 2009, shortly before work began. The second was a check for

$15,750.00, issued March 16, 2009, shortly after work began. The first was based on an invoice

prepared by Mr. Ratz for framing, footing, wall, stone, excavation, hauling, demolition and permits.

(Ex. H). The second was based on an invoice for purchase of all electric supplies and payment to

electric contractor and ComEd, to purchase all plumbing material and payment to plumbing

contractor, to purchase lumber, roof trussels, shingles, metal flashing, payment to carpenter

contractor, to pay for all inspections to date and future, and to purchase all tile, flooring, paint and

fixtures. (Ex. I). However, Ms. Sullivan acknowledged that the invoices were descriptions of how

the funds were intended to be used - not representations that the work had already been done, and

in fact the first invoice was prepared and submitted several days before any work began.

Mr. Ratz began work on the project in March 2009. Over a period of two days, he and

several workers excavated the site. Thereafter, Ms. Sullivan became frustrated when several days

passed without Mr. Ratz or his workmen returning, and Ms. Sullivan called Mr. Ratz several times

to inquire. He responded that he had other jobs he was working on but would be back soon. At the

end of March, three people, including Steve Kampschroer, moved an electric line from the garage

to the side of the house where the addition was to be. In mid-April, Mr. Ratz returned with two or

three men and moved a shed. At some point in April, Mr. Ratz informed Ms. Sullivan that his

father-in-law was ill and dying and that he had to be with him and his wife. In mid-May, Mr. Ratz

or his workers poured the concrete foundation for the addition. At the end of May, Mr. Ratz returned

with a Bobcat, which he used to push the soil against the foundation to fill a gap. Ms. Sullivan

complained at this time to Mr. Ratz about the quality of the concrete that had been poured. In early

June, Mr. Ratz returned with a carpenter to discuss cabinets. In early July, Mr. Ratz informed Ms.

Sullivan that his sister was ill in Florida, and that he had to go to be with them. Several days later,

he informed her that his sister had died. In late July, Mr. Ratz informed Ms. Sullivan that he was

back in town, but had to work on another job to get the money to pay his crew before they could

come back to Ms. Sullivan's house.

Ms. Sullivan, frustrated with the delays and Mr. Ratz's failure to return her calls quickly,

terminated Mr. Ratz on July 29, 2009 by e-mail. Thereafter, Mr. Ratz asked several times to be

allowed to finish the project, but Ms. Sullivan would not reconsider. Instead, two neighbors, Frank

Von Derau and Mark Elkins, and one of the workers who had been hired but not paid by Mr. Ratz,

Steven Kampschroer, volunteered their services to complete the addition. Some wavy portions of

the foundation that Mr. Ratz had poured had to be corrected, but otherwise they were able to build

on the foundation. It took the volunteers about six months to complete the addition, partially because

they were only working on it in their free time. Ms. Sullivan paid for some of the materials used, but

otherwise did not pay the volunteers for their work.

A man named Angel Perez, or his company Angel Construction, was somehow connected

with the project. Mr. Perez was present in August 2007 at the first meeting with Ms. Sullivan at her

house, and was present for at least some of the work done on the project. He prepared the drawings for the project, though there was some testimony that he was not a licensed architect. He also pulled the permit for the construction on the project. However, Ms. Sullivan admitted that she did not know if he was an employee of Mr. Ratz's or had some other relationship to the project, such as subcontractor. Mr. Ratz testified that Angel Perez "did not work with us on that project, but he was going to." (Tr. 623). It is unclear what this testimony meant, since the evidence demonstrated that Mr. Perez did in fact do at least some work on the project. Ms. Sullivan testified that Mr. Ratz had told her that Mr. Perez "would be the carpenter." (Tr. 390). Therefore, it seems that his main role was to be in the construction of the addition after the foundation was laid, but that Mr. Ratz was terminated before the above-ground construction began. Mr. Ratz testified that he had intended "to use the insurance of Angel Construction" for the project. (Tr. 58). However, Ms. Sullivan claims that none of the work on the project was covered by liability insurance. She independently researched and discovered that Angel Construction had an insurance policy issued by Grange Insurance. Ms. Sullivan submitted a claim to Grange Insurance, to which she received a response that they could not help her because Ms. Sullivan had alleged that she hired Extreme Concrete and Extreme Concrete was not an insured under any policy issued by Grange Insurance. (Ex. J).

Mr. Ratz was affiliated with several corporations. Ex-Tream Con-Crete Inc. was owned by Ivy King, a former girlfriend of Mr. Ratz's, was incorporated in Illinois on May 30, 2007, and was involuntarily dissolved on October 10, 2008. Ex-Tream Con-Crete Concepts, Inc. was owned by Mr. Ratz, incorporated on May 15, 2008, and involuntarily dissolved on October 9, 2009. Excellent Concrete Concept Inc. is owned by Mr. Ratz's wife, is still active, and was incorporated on February

4, 2009. Mr. Ratz claimed that he was solely an employee of Ex-Tream Con-Crete Inc., and currently is solely an employee of Excellent Concrete Concept Inc. Mr. Ratz claimed that the original contract with Ms. Sullivan entered into in August 2007 was with Ex-Tream Con-Crete Inc., despite the fact that the corporation was dissolved five months before work on the project began. He also claimed that he performed the work on the project as an employee of Ex-Tream Con-Crete Concepts, Inc., but admitted that the contract was never formally assigned to Ex-Tream Con-Crete Concepts, Inc., and that Ms. Sullivan was never informed of and never consented to any such assignment. Mr. Ratz further admitted that he personally received the funds distributed by Security Bank to "Extreme Concrete."

Mr. Ratz filed a petition for protection under Chapter 7 of the Bankruptcy Code with this Court on March 16, 2010. In his bankruptcy schedules, he listed only two vehicles, a 1996 Ford F350 and a 1991 Honda Accord. He listed his marital status as single. In his Statement of Financial Affairs, he listed his gross income from employment or operation of business as $14,000 for 2008, $8,500 for 2009, and $2,000 for 2010 through the date of the petition. After being questioned about several vehicles and his marital status at the 341 meeting of creditors on April 26, 2010, he filed amended schedules on April 28, 2010, to change his marital status to "married, not filing jointly, with declaration of separate households" and to add a 2001 Ford F350, a 1996 Chevy Lumina, a 2000 Oldsmobile Bravada and a 1999 BMW 528l.

## II. DISCUSSION

### A. SECTION 523(a)(2)(A)

A discharge in a Chapter 7 bankruptcy discharges all debts and other liabilities that arose

prior to the filing of the bankruptcy petition except for debts specifically excepted from discharge

by Section 523 of the Bankruptcy Code. See 11 U.S.C. §727(b).  In order to protect a debtor's right

to a 'fresh start,' "exceptions to discharge are to be constructed strictly against a creditor and

liberally in favor of the debtor." In re Morris, 223 F.3d 548, 552 (7th Cir. 2000). Ms. Sullivan argues

that she was induced by fraud or misrepresentation to hire and to pay Mr. Ratz, and that therefore

the debt Mr. Ratz owes her for his failure to complete the construction project on her home is

non-dischargeable under Section 523(a)(2)(A).    To receive an exception from discharge under

Section 523(a)(2)(A), a plaintiff must demonstrate three elements: (1) that the debtor made a false

representation or omission, which he either knew was false or made with reckless disregard for the

truth, (2) that the debtor possessed an intent to deceive or defraud, and (3) that the plaintiff justifiably

relied on the false representation.  In re Davis, 638 F.3d 549, 553 (7th Cir. 2011). The plaintiff bears

the burden of proving each element by the preponderance of the evidence. Ojeda v. Goldberg, 599

F.3d 712, 716 (7th Cir. 2010).

1.      **Intention at Time of Contracting not to Perform**

Ms. Sullivan first argues that Mr. Ratz committed fraud or misrepresentation by promising

to build the addition to her home and entering into the contract while intending to never perform.

However, the facts presented at trial plainly contradicted such an argument.  It was undisputed that

Mr. Ratz and workers he retained did substantial work on the project, including digging and

excavating the site, pouring a concrete foundation, and moving an electrical line. Mr. Ratz may have

done a poor job on some of these tasks, and may have taken longer than he should have to complete

them, but the evidence shows that he always intended to complete the contract. It was Ms. Sullivan who terminated Mr. Ratz. She may have been justified in doing so, based on the delays and lack of quality of work, but that is not relevant to the question of whether Mr. Ratz intended to complete the project. Mr. Ratz testified that, even after Ms. Sullivan terminated him, he made numerous offers to complete the job. Such testimony was uncontradicted. Moreover, Ms. Sullivan specifically testified that she did not believe that Mr. Ratz intended to deceive her when she entered into the contract. (Tr. 608-609).

Ms. Sullivan also argues that Mr. Ratz misrepresented that he would complete the job "within a reasonable time" when he had no such intention. However, again, Ms. Sullivan failed to prove this assertion. First, the written contract made no mention of a timeline or any specific dates by which the project was to be completed. Nor did Ms. Sullivan present evidence that Mr. Ratz had agreed to complete the project within any specific time. Second, even if some timeline was implied or separately agreed upon, Ms. Sullivan did not demonstrate that Mr. Ratz had any intention other than to complete the project as quickly as he could at the time he entered into the contract or at the time he received any payment. Instead, the evidence showed that Mr. Ratz was subsequently distracted by other projects, distracted by health issues in his family, and was unorganized and generally unable to coordinate workers and subcontractors that he retained. Ms. Sullivan did not demonstrate that Mr. Ratz ever intentionally delayed work on the project. Mr. Ratz's excuses might not have justified his delay in performance and Ms. Sullivan may have been justified in terminating him under contract law, but the excuses tend to show that Mr. Ratz's actions were not fraudulent.

## 2.    Corporate Existence

There was some doubt whether Mr. Ratz was acting on behalf of a separate corporate entity

or on his own behalf when he entered into the contract with Ms. Sullivan, and Ms. Sullivan argues

that Mr. Ratz made a false misrepresentation in this respect. However, even if Mr. Sullivan made

a misrepresentation about the capacity he was acting in, Ms. Sullivan has not demonstrated that she

acted in reliance on such misrepresentation or that it was material. There was no evidence to suggest

that it would have mattered to Ms. Sullivan if Mr. Ratz was acting as an employee of a corporation

or if instead the company name was simply an unincorporated name that Mr. Ratz did business as.

Mr. Ratz has not attempted to hide behind a corporation as a shield to liability. Nor is there any

evidence that Ms. Sullivan relied on the assets or reputation of "Ex-Tream Con-Crete" or that she

even knew anything about such entity. Nor is there any evidence that she relied on there being a

person named "Ivy Ratz" as the owner of such entity, or that it was material whether or not such

person was married to Mr. Ratz.[1]

### 3.   Licensing and Qualification

Ms. Sullivan argues that Mr. Ratz misrepresented that he was licensed to complete the

project. The written contract did specifically represent that Ex-Tream Concrete was "licensed."

However, Ms. Sullivan admitted that she never asked what type of licenses Mr. Ratz or his company

had, and never asked to see a copy of any license. Ms. Sullivan has not suggested any particular

license Mr. Ratz was required to have but did not.[2] She therefore failed to prove the falsity of the

---

[1] For simplicity, and since the precise corporate capacity is not relevant, in the following sections I will refer to Mr. Ratz individually, rather than referring to "Mr. Ratz, Ex-Tream Con-Crete Inc. or Ex-Tream Con-Crete Concepts, Inc., as applicable," each time.

[2] There was some testimony that Angel Perez, who prepared the drawings for the project was not a licensed architect. However, no evidence was presented that Mr. Ratz ever made any specific representations about Mr. Perez's qualifications. Nor was any evidence presented that any particular license was required by law. Finally, no

representation or that it was material or that she relied upon it.

Ms. Sullivan also argues that Mr. Ratz misrepresented that he was 'qualified' to complete the project. However, she provided no evidence that Mr. Ratz made any specific representation as to his qualifications. More importantly, even if he was unqualified, Ms. Sullivan provided no evidence that Mr. Ratz himself realized that he was unqualified to complete the project or to hire or subcontract qualified workers. It is undisputed that Mr. Ratz had years of experience doing construction projects. While there was some evidence presented that he might not have been very good at what he did, there was no evidence to suggest that he was intentionally and fraudulently misrepresenting his abilities.

Finally, Ms. Sullivan argues that Mr. Ratz misrepresented that he would comply with building codes. However, first, no evidence was presented that he made any such specific representation. Second, Ms. Sullivan did not demonstrate that Mr. Ratz actually violated any building codes. Finally, even if any such code was violated, no evidence was presented that the violation was intentional, or that Mr. Ratz intended to violate any such code at the time he entered into the contract or accepted payment.

### 4.   Insurance

Ms. Sullivan's strongest argument is that Mr. Ratz misrepresented in the contract that he was "insured" or would obtain public liability insurance to cover the work performed. However, Ms. Sullivan failed to meet her burden of proof on this point. First, Ms. Sullivan did not provide testimony or evidence that insurance was material to her at the time she entered into the contract or

evidence was presented that Mr. Ratz knew at the relevant times that Mr. Perez lacked any required license or qualification.

that she relied on there being insurance when she entered into the agreement with Mr. Ratz. Ms.

Sullivan admitted that she made no inquiry into what type of insurance Mr. Ratz or his company had

or what it covered. While there was a representation about insurance in the written agreement, there

was no testimony that she even noticed the provision, which was part of the pre-printed form, or

cared about it when she signed the agreement. Even when she later tried to file an insurance claim

against Angel Construction's insurance policy, she testified that she submitted the claim "to try to

recover some of the money" that she had paid to Mr. Ratz. (Tr. 419). However, the agreement only

stated that Mr. Ratz or his company would obtain public liability insurance. No evidence was

presented to show that such public liability insurance would cover breach of contract damages for

failure to complete a project. Ms. Sullivan therefore failed to demonstrate that insurance was

material to her decision to enter into a contract with or pay Mr. Ratz.

Second, Mr. Ratz testified that he did have insurance. While it seems doubtful that he or his

company personally had insurance that would have covered the project, Ms. Sullivan failed to

demonstrate that no insurance covered the project. Mr. Ratz did testify that he "did not do the work

under [his own] insurance," but he also testified that he believed "the work was to be done under

Angel Construction['s] insurance." (Tr. 58: 15-24). If such insurance in fact covered all of the work

performed, it should have made little difference to Ms. Sullivan that Mr. Ratz or Ex-Treme Concrete

Inc. had not personally obtained the insurance. Ms. Sullivan argues that Angel Construction's

insurance did not cover the project. However, her only evidence of this was a letter she received

back from Grange Insurance that informed her that Extreme Concrete was not an insured under a

policy issued to Angel Construction (Ex. J). The problem is that the letter does not necessarily

demonstrate that the work was not covered. Mr. Ratz never told Ms. Sullivan to file a claim on

Angel Construction's policy. Instead, she did so based on her own speculation. She admitted that she

never asked Mr. Ratz for a copy of his insurance policy or how or with whom he was insured.

Moreover, the letter simply states that Extreme Concrete was not an insured under the Angel

Construction policy. The letter does not demonstrate that the work was not performed through Angel

Construction as a sub-contractor; rather, it appears that Ms. Sullivan made no such allegation to the

insurance company. Although the precise nature of Angel Perez or Angel Construction's role in the

construction project was not made clear in the testimony and evidence, the evidence was not

inconsistent with Angel Construction being a subcontractor for the whole project. There was

uncontroverted testimony that it was Angel Construction who pulled the permit for construction and

that Angel Perez prepared the drawings for the project. Ms. Sullivan also testified that Angel Perez

was present with Mr. Ratz at one of the early meetings in August 2007 and that Angel was present

at at least during some of the work. Furthermore, Mr. Ratz testified that "the work was to be done

under Angel Construction['s] insurance." (Tr. 58:22-25). Thus, Ms. Sullivan has not demonstrated

that Grange Insurance would have rejected a proper claim that described Angel Construction's

involvement in and connection to the project.

Finally, even if the work was not in fact covered by any insurance, Ms. Sullivan had to

demonstrate that Mr. Ratz *knew* this to be the case and intentionally misrepresented that fact to Ms.

Sullivan. Mr. Ratz testified that he intended to use Angel's insurance and believed the work would

be covered. Ms. Sullivan did not demonstrate that, based on his education and experience, and under

the circumstances he should have known better.

## B. SECTION 727(a)(4)(A)

Ms. Sullivan also seeks to deny Mr. Ratz a discharge under Section 727(a)(4)(A), arguing

that he made false statements and omissions in his bankruptcy schedules. A plaintiff seeking to deny

a discharge under Section 727(a)(4)(A) "must prove by the preponderance of the evidence that: (1)

the debtor made a statement under oath; (2) the statement was false; (3) the debtor knew the

statement was false; (4) the debtor made the statement with fraudulent intent; and (5) the statement

related materially to the bankruptcy case." Stamat v. Neary, 635 F.3d 974, 978 (7th Cir. 2011). A

showing of "reckless disregard for the truth is sufficient to prove fraudulent intent." Stamat, 635

F.3d at 982. A fact is material "if it bears a relationship to the debtor's business transactions or

estate, or concerns the discovery of assets, business dealings, or the existence and disposition of the

debtor's property" and the issue "is not merely the value of the omitted assets or whether the

omission was detrimental to creditors." Stamat, 635 F.3d at 982; but see Alleman v. Kitson, 341

Fed. Appx. 234 (7th Cir. Aug. 17, 2009) (finding that omission of several unsecured debts was

immaterial because there were no assets for distribution and therefore "the omission had no effect

on whether any of the unsecured creditors, including [plaintiff], would receive any distribution from

the estate"). Numerous false oaths that a debtor knows to be inaccurate can have a "cumulative

effect" making the false statements material and can establish "a pattern of reckless indifference to

the truth." Stamat, 635 F.3d at 979. It "remains within the discretion of a bankruptcy court to grant

a discharge even when grounds for denial of discharge are demonstrated to exist." Union Planters

Bank, N.A. v. Connors, 283 F.3d 896, 901 (7th Cir. 2002); see also Prairie Prod. Credit Ass'n. v.

Suttles (In re Suttles), 819 F.2d 764, 766 (7th Cir. 1987) (court has broad discretion to grant a

discharge where failure to maintain records was "an honest mistake" and debtor "did not intend to violate the Bankruptcy Code").

## 1.    Vehicles

Ms. Sullivan alleges that Mr. Ratz failed to list five vehicles. With respect to four of the vehicles, Mr. Ratz answered questions about them at the 341 meeting and amended his schedules to disclose them on April 28, 2010, two days after the initial 341 meeting.   It is true that an amendment to a schedule does "not negate a finding of intent or cure the initial failures." Stamat, 635 F.3d at 982. However, the fact that a debtor quickly amends a schedule after learning of an omission does support an argument that the original omission was not intentional.   Mr. Ratz offered some explanation to suggest the omission was a mistake, not intentional.   He stated that it was "a gray area" as to whether he owned the vehicles at the time of the petition. (Tr. 127). Presumably this was either because he thought his wife might own the vehicle or because a vehicle was owned by a corporation he or his wife owned.[3]   Also tending to support Mr. Ratz's argument that the omission was not intentional is that, based on the values listed in the amended schedules - which Ms. Sullivan has not challenged - he had little or no equity in the unlisted vehicles.   According to his amended Schedule D, he only had equity in the BMW, and even then only equity of $300.   The Chapter 7 Trustee eventually filed a no-asset report about a month after the amended schedules were filed.

---

[3] See, e.g., Fowler v. Shadel, 400 F.3d 1016,1019 (7th Cir. 2005) ("[W]hile the individual's interest in the partnership or corporation (which could be 100%) would be property of the estate, the assets of the partnership or corporation would not be.") (internal citation omitted).   While it is true that "assets of a purportedly separate entity can be treated as assets of the estate, including for purposes of Sections 727(a)(4)(A) and 727(a)(3), where the entity is merely the alter ego of the debtor," Neary v. Mosher (In re Mosher), 417 B.R. 772, 780 (Bankr. N.D. Ill. 2009), Ms. Sullivan has not argued that Excellent Concrete Concept, Inc., which was not owned by Mr. Ratz, was a mere alter ego.

Ms. Sullivan also argued, but was unable to prove, that Mr. Ratz owned a fifth vehicle that was never disclosed in any amended schedule: a blue pickup truck with the name "Ex-Cellent Con-Crete" on it. Ms. Sullivan did not submit a copy of a certificate of title for the truck or for any of the other vehicles. Instead, her main evidence was a picture of the truck parked in front of Mr. Ratz's wife's house. However, the car being parked there would not be inconsistent with the truck being owned by either Mr. Ratz's wife or by the corporation Excellent Concrete Concept, Inc. The undisputed evidence showed that Excellent Concrete Concept, Inc. was owned by Mr. Ratz's wife, Geneva. Ms. Sullivan's only other evidence was her testimony that when she brought a picture of the truck to the 341 meeting, Mr. Ratz "leaped out of his chair and shouted, 'that's my truck.'" (Tr. 526). Ms. Sullivan did not submit a copy of the transcript from the 341 meeting, which she claims she was unable to obtain, and provided no context for the alleged exclamation by Mr. Ratz. Without such context, I simply cannot find it plausible that anyone would spontaneously leap to their feet and shout "That's my truck!" upon being shown a photograph. Ms. Sullivan therefore failed to prove that Mr. Ratz owned the blue truck as of the petition date or intentionally failed to disclose it.

## 2.    **Marital Status and Residence**

Ms. Sullivan alleges that Mr. Ratz intentionally misrepresented his status in his bankruptcy schedules to state that he was single, presumably to avoid disclosing his wife's income and assets. However, Ms. Sullivan admitted that Mr. Ratz informed creditors at the 341 meeting that he was married, and admitted that he filed amended schedules two days after the 341 meeting with an amended Form B22A Means Test form correctly stating his status as married. Because he included a declaration of separate households, he was still not required to include his spouse's income in the

Form B22A or in Schedules I or J, so the omission had little impact. Ms. Sullivan argued that Mr.

Ratz was lying about being separated from his wife, but failed to prove this. Mr. Ratz admitted that

he had reconciled with his wife post-petition and was living with her again as of the time of the trial,

in October 2011. But the relevant time was the petition date. Ms. Sullivan speculated that Mr. Ratz

was still living with his wife as of the petition date, but provided little or no evidence to contradict

Mr. Ratz's testimony that he was separated and was living with his mother at that time. Ms.

Sullivan's evidence consisted of (i) the testimony of Lloyd George Popp that when he spoke to Mr.

Ratz in "either the fall or the spring or the summer" of 2009, Mr. Ratz indicated he was living

somewhere in the vicinity of Mr. Ratz's wife's house and (ii) a picture taken sometime between late

April 2010 and July 2010 of a blue truck with the logo "Ex-Cellent Concrete" on it parked in front

of Mr. Ratz's wife's house.  As noted above, Ms. Sullivan failed to prove that the blue truck was

owned by Mr. Ratz, and since Excellent Concrete Concept, Inc. was owned by Mr. Ratz's wife, it

was not unusual that the car was parked in front of her house.  Even if Mr. Ratz did own or use the

truck, that fact that it was parked in front of his wife's house at one point does not prove that Mr.

Ratz was living in the house.  He could have just been visiting, or could have parked the car there

with her permission if he had limited parking at his mother's home.  Additionally, the relevant time

for the schedules was the date of the petition, not one to three months after the petition or a year

before.  Thus, even if the evidence were sufficient to show that Mr. Ratz was living with his wife

in the summer of 2009 and again in the summer of 2009, it is not inconsistent with Mr. Ratz's

testimony that he was temporarily separated from his wife at the time of the petition and reconciled

with her thereafter.  Without more, the Court will not take the leap to infer that the separation was

a sham, which Ms. Sullivan has not demonstrated by the preponderance of the evidence.

### 3.   Income

Finally, Ms. Sullivan failed to prove that Mr. Ratz had intentionally understated his income when he stated in his Statement of Financial Affairs that his gross income was $14,000 in 2008, $8,500 in 2009, and $2,000 for January through March 2010. First, Ms. Sullivan's argument was highly speculative, and she gave no indication of what she believed Mr. Ratz's actual gross income to be during those periods. Instead, she simply provided testimony that Mr. Ratz had stated some time in 2009 that his "business was booming" (Tr. 200-203) and Mr. Ratz's own testimony that he had worked on "over a thousand jobs" between 2007 and the date of the trial (Tr. 641). However, first, the fact that Mr. Ratz was working on jobs does not necessarily mean that he was getting paid by those customers. This is especially so because corporate entities might have been involved. Ms. Sullivan never sought to have any of the corporations treated as alter egos of Mr. Ratz, and other than the job for Ms. Sullivan, gave no evidence as to whether Mr. Sullivan was legitimately acting solely as an employee of a corporation for any of the other jobs. Nor did she give details about the corporate entities that may have been involved. It was undisputed that several were owned by individuals other than Mr. Ratz, and therefore Mr. Ratz may have had no right to distributions of corporate profits. Also, the Seventh Circuit Court of Appeals has indicated that income earned by a C corporation is not treated as income of a debtor shareholder for purposes of Section 727(a)(4) until such income is distributed to the shareholder. <u>Alleman v. Kitson (In re Kitson)</u>, 2009 WL 2488380 (7th Cir. Aug. 17, 2009).

Mr. Ratz did admit that he personally received $28,000 from Ms. Sullivan in the Spring of

2009, and that this was not reflected in the gross income for 2009 in his Statement of Financial Affairs. However, it appears that Mr. Ratz confused net income, or profit, for gross income, which is required to be disclosed in the Statement of Financial Affairs. While the Statement of Financial Affairs requires debtors to list their gross income, Ms. Sullivan failed to demonstrate that Mr. Ratz's failure to disclose at least $14,000 in payments received from Ms. Sullivan in 2009 was intentional. Unlike the debtor in In re Moser, 417 B.R. 772 (Bankr. N.D. Ill. 2009), Mr. Ratz did not appear to be a highly educated or highly sophisticated businessman who should have known the difference between gross income and net income. While Mr. Ratz apparently had incorporated several companies in his past, he did not seem to recognize the meaning and implications of incorporation, or to even understand how to keep those corporations from being involuntarily dissolved. Without more, Ms. Sullivan failed to demonstrate that Mr. Ratz made any statement material to the bankruptcy which he knew to be false with fraudulent intent.

## C. SECTION 727(a)(3)

A court may deny a debtor a discharge if the debtor "has concealed, destroyed, mutilated, falsified, or failed to keep or preserve any recorded information, including books, documents, records, and papers, from which the debtor's financial condition or business transactions might be ascertained, unless such act or failure to act was justified under all of the circumstances of the case." 11 U.S.C.A. § 727(a)(3) (West 2012). A debtor is required to "produce records that provide enough information to ascertain the debtor's financial condition and track his financial dealings with substantial completeness and accuracy for a reasonable period past to present." Union Planters Bank, N.A. v. Connors, 283 F.3d 896, 899 (7th Cir. 2002) (internal citation and quotation marks omitted).

The right to a discharge is a privilege for which Section 727(a)(3) imposes an affirmative duty to keep records. Peterson v. Scott (In re Scott), 172 F.3d 959, 969 (7th Cir. 1999). However, the type and level of records that a debtor is required to maintain and produce depend on the circumstances. "Where debtors are sophisticated in business, and carry on a business involving significant assets, creditors have an expectation of greater and better record keeping." Union Planters, 283 F.3d at 900 (internal citation omitted). Section 727(a)(3) "does not require proof of criminal or quasi-criminal conduct." In re Scott, 172 F.3d at 969.

Here, Ms. Sullivan failed to prove by the preponderance of the evidence that Mr. Ratz failed to keep or preserve financial records. While Ms. Sullivan argues that Mr. Ratz admitted that he did not keep or maintain any receipts or other financial documentation, in many cases his actual statement was that he did not have copies *at the time Ms. Sullivan requested them* in discovery. But, Mr. Ratz also testified that he had given all such documents to his bankruptcy attorney, who he subsequently fired, not that they did not exist. Mr. Ratz did admit that that some of the payments he made on the project for Ms. Sullivan were made in cash, and that he did not have receipts for those payments. However, it is notable that the Chapter 7 Trustee apparently had no problem with the financial documents that were provided in the bankruptcy, and Ms. Sullivan has failed to demonstrate that any specific document was required to determine Mr. Ratz's financial condition or dealings under the circumstances. While there is an affirmative duty to maintain financial records, there is no bright-line rule that a failure to have receipts for every purchase a debtor ever made will result in a denial of discharge. The contract with Ms. Sullivan was for a flat rate, not based on actual costs. With respect to the records of the business, Ms. Sullivan failed to demonstrate that Mr. Ratz

was obligated to maintain business records for the corporations, at least several of which he had no ownership interest and testified that he was only an employee.

Finally, Ms. Sullivan argues that Mr. Ratz falsified recorded information. Included in a response to Ms. Sullivan's request for production of documents was a document purportedly sent by Matt Moser to Mr. Ratz's former attorney memorializing a verbal agreement for Moser Development Inc. to act as a subcontractor on the project at Ms. Sullivan's house. At trial Matt Moser testified that he had never entered into any agreement with Mr. Ratz and that the signature on the document was not his own. However, first, Mr. Moser testified that he had heard of Moser Development, but that it was not his company. Therefore, the Matt Moser who testified might not have been the same Matt Moser who signed the document. Mr. Moser did testify that the handwriting on the fax transmittal sheet to Mr. Ratz's former lawyer was his own. But, there was no testimony or evidence to show that the document was in fact an attachment to the fax transmittal sheet, which indicated it had three pages, not two. Perhaps when compiling documents, Mr. Ratz's former attorney had put together two documents that were unrelated. Or, even if it were to be believed that the document purportedly signed by Matt Moser was forged, no evidence was presented to demonstrate that it was Mr. Ratz who created the document or that he was aware that it was not authentic. Therefore, Ms. Sullivan failed to meet her burden to prove that Mr. Ratz falsified recorded information.

## D. STATE LAW COUNTS

Having found that Ms. Sullivan failed to meet her burden of demonstrating that any debt is non-dischargeable under Section 523 or that Mr. Ratz should be denied a discharge, the remainder

of her state law claims will be dismissed for want of subject matter jurisdiction. The Chapter 7

Trustee has filed a no-asset report, and the only reason that the case remains open and Mr. Ratz has

not received a discharge is because of the pending claims under Section 727(a). Since the Section

523(a) and Section 727(a) claims are being denied, Mr. Ratz's personal liability for the state law

claims will be discharged upon entry of the discharge, and since the Trustee has filed a no-asset

report any assets that were in the bankruptcy estate will be abandoned to Mr. Ratz by the Trustee

under Section 554(c) by operation of the no-asset report and closure of the case. As such, the

resolution of the discharged state law claims could have no foreseeable "effect on the estate of the

debtor," and therefore the claims are not "related to" a case under Title 11, as would be required for

this Court to maintain jurisdiction under 28 U.S.C. §1334(b). Chicago Materials Corp. v.

Hildebrandt (In re Hildebrandt), 2012 WL 260036 (Bankr. N.D. Ill. Jan. 27, 2012) (quoting In re

Liburd-Chow, 434 B.R. 863, 867-68 (Bankr. N.D. Ill. 2010)).


### III. CONCLUSION

For the foregoing reasons, the Court will enter judgment in favor of the Defendant on Count

III (Section 523(a)(2)(A)), Count IV (Section 727(a)(4)(A)), and Count V (Section 727(a)(3)); Count

I (Fraud in the Contract) and Count II (815 ILCS 505/2B) will be dismissed for lack of subject-

matter jurisdiction.

The foregoing constitutes findings of fact and conclusions of law as required by Fed. R. Civ.

P. 52(a) and Fed. R. Bankr. P. 7052. A separate order shall be entered giving effect to the

determinations reached herein.

DATE:  May 31, 2012

The Honorable Manuel Barbosa
United States Bankruptcy Judge